# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-1437V
Filed: June 16, 2022

```
* * * * * * * * * * * * * *
LISSETTE LIMONTA,                    *
                                     *
                Petitioner,          *
v.                                   *        Special Master Roth
                                     *
SECRETARY OF HEALTH                  *
AND HUMAN SERVICES,                  *
                                     *
                Respondent.          *
* * * * * * * * * * * * * *
```

*Robert Hanreck, Esq.*, Robert J. Hanreck, P.A. Miami, FL, for petitioner.
*Emilie Williams, Esq*., U.S. Department of Justice, Washington, DC, for respondent.

## ORDER DEFERRING DECISION ON INTERIM FEES AND COSTS APPLICATION[1]

**Roth**, Special Master:

On September 20, 2018, Lissette Limonta ("Ms. Limonta," or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleges that she suffered from both vaccine injury table and off table injuries resulting from adverse effects of an influenza ("flu") vaccination she received on October 6, 2015. *See* Petition at 1; ECF No. 1. More specifically, petitioner alleges that she suffered anaphylaxis, angioneurotic (sic) edema, and swelling of the face, tongue, and lips as a result of the October 6, 2015 flu vaccine and thereafter continued to suffer reoccurrences of the angioneurotic (sic) edema, swelling of the face, tongue, and lips caused by the vaccination. *See* Petition, ECF No. 1.

On December 30, 2021, petitioner's counsel filed a Motion for Interim Attorneys' Fees and Costs. ECF No. 57. Following a Motion for extension of time within which to file a response, which was granted, respondent responded to the Motion for Interim Fees raising good faith and

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I intend to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2012)).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information, that satisfies the criteria in 42 U.S.C. § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision.  If, upon review, I agree that the identified material fits within the requirements of that provision, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

reasonable basis in the filing and continuation of this matter. ECF Nos. 60, 62. For the reasons detailed below, I am deferring ruling on petitioner's application and will consider it again at a later date.

# I.   Background

## A.   Petitioner's Allegations of Injury

Petitioner has a past medical history of hypertension, type 2 diabetes with hyperglycemia[3] and leg swelling, irritated seborrheic keratosis,[4] degenerative joint disease, osteoarthritis,[5] and frequent episodes of back pain associated with stiffness and improved with Tramadol.[6] Pet. Ex. 9 at 12-13, 15, 16; Pet. Ex. 12; Pet. Ex. 13 at 3; Pet. Ex. 15 at 2.

Petitioner is a nurse, and she received the subject flu vaccine at work on October 6, 2015 at approximately 6:30 am. Pet. Ex. 1; Pet. Ex. 36 at 1.

Petitioner presented to the emergency room at 4:41 pm, approximately 10 hours later, with swelling of her lips and the right side of her face. She reported receipt of a flu vaccine that morning at around 7 am. Pet. Ex. 21 at 3, 42. Petitioner was able to speak in full sentences and did not have shortness of breath or swelling of the tongue. *Id*. It was noted that she was taking Metformin[7] for type 2 diabetes and Losartan[8] for hypertension. *Id*. at 35, 42. Petitioner was diagnosed with angioedema[9] without airway obstruction, "probably secondary to influenza vaccine," and

---

[3] Hyperglycemia is defined as "abnormally increased glucose in the blood." *Dorland's Illustrated Medical Dictionary* 878. (33rd ed. 2019) [hereinafter "*Dorland's*"].

[4] Seborrheic keratosis is defined as "a common, usually benign type of skin lesion composed of basaloid cells; it usually first appears after age 30 and presents as a soft, friable plaque with variable pigmentation. The most common sites are the face, trunk, and limbs." *Dorland's* 970.

[5] Osteoarthritis is defined as "a non-inflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." Osteoarthritis is also called degenerative joint disease. *Dorland's* 1326.

[6] Tramadol is defined as "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally." *Dorland's* 1920.

[7] Metformin is defined as "a biguanide antihyperglycemic agent that potentiates the action of insulin, used in the treatment of type 2 diabetes mellitus; administered orally." *Dorland's* 1129.

[8] Losartan is defined as "an angiotensin II receptor antagonist, used as an antihypertensive; administered orally." *Dorland's* 1061.

[9] Angioedema is defined as "a vascular reaction involving the deep dermis or subcutaneous or submucosal tissues, representing localized edema caused by dilatation and increased permeability of capillaries, with development of giant wheals." *Dorland's* 83. A wheal is "the dermal evidence of allergy . . . a smooth, slightly elevated, discolored area on the body surface, often accompanied by severe itching." Wheals are also known as hives. *Dorland's* 2049.

prescribed prednisone,[10] Pepcid,[11] cetirizine,[12] and an EpiPen. *Id*. at 24, 42-43. Petitioner affirmed that the nurse in charge of epidemiology sent a report to the vaccine manufacturer to advise of her reaction. Pet. Ex. 36 at 1-2. That report was not produced. There is no mention in the record of petitioner suffering from "urticarial lesions."[13]

Petitioner affirmed suffering several other episodes of angioedema during the month following October 6, 2015. Pet. Ex. 36 at 2. There were no records filed of any medical visits or telephone calls to any medical provider advising of these episodes.

On November 9, 2015, petitioner returned to the emergency room complaining of facial and lip swelling "since last night." Pet. Ex. 4 at 1, 9. There was no respiratory involvement noted. *Id*. at 9. Petitioner was admitted and administered IV steroids and antihistamines. *Id*. at 12. She was notably diabetic with an expected rise in blood sugar due to steroid use. *Id*. She was discharged on November 11, 2015. *Id*. at 17. It was specifically noted that she did not have itching or rash. *Id*. at 22. Her hypertension medication was changed to amlodipine.[14] *Id*. at 27. There was no mention of "urticarial lesions" or report of other episodes of angioedema other than on October 6, 2015.

Petitioner presented to Dr. De La Cruz on November 23, 2015, for "follow up of allergic reaction." Pet. Ex. 28 at 1. Dr. De La Cruz planned to run an allergy panel and test for IgE level. *Id*. at 2. Dr. De La Cruz's diagnosis was allergic reaction and angioedema. She was instructed to continue taking amlodipine, cetirizine, Pepcid, hydroxyzine pamoate,[15] and Metformin. *Id*. The allergy testing dated December 2, 2015, was notable for sensitivity to corn, green pea, tomato, orange, grass, maple, and cats, but not significant for egg whites.[16] Pet. Ex. 5 at 6-9.

Petitioner returned to Dr. De La Cruz on December 15, 2015. Her examination was normal, and she was to continue with the same medications. Pet. Ex. 6 at 4.

---

[10] Prednisone is defined as "a synthetic glucocorticoid derived from cortisone, administered orally as an anti-inflammatory and immunosuppressant in a wide variety of disorders." *Dorland's* 1486.

[11] Pepcid is a trademark for preparations of famotidine. *Dorland's* 1387. Famotidine is "a histamine $H_2$ receptor antagonist; it inhibits gastric acid secretion and is used in the prophylaxis and treatment of peptic ulcer, the relief of symptoms associated with hyperacidity, and the treatment of gastroesophageal reflux disease". *Dorland's* 671.

[12] Cetirizine is defined as "a nonsedating antihistamine that is a metabolite of hydroxyzine, used in treatment of allergic rhinitis and chronic idiopathic urticaria, and as a treatment adjunct in asthma; administered orally." *Dorland's* 329.

[13] Urticaria is defined as "a vascular reaction in the upper dermis, usually transient, consisting of localized edema caused by dilatation and increased capillary permeability with wheals." *Dorland's* 1981.

[14] Amlodipine is defined as "a calcium channel blocking agent used in the treatment of hypertension and chronic stable and vasospastic angina; administered orally." *Dorland's* 63.

[15] Hydroxyzine pamoate is "the pamoate salt of hydroxyzine, having the actions and uses of the hydrochloride salt", which is "used as an antianxiety agent and antiemetic, in urticaria and other manifestations of allergic dermatoses". *Dorland's* 873.

[16] The most common method for producing influenza vaccines involves injection of the virus into embryonated chicken eggs to grow. Rina Fajri Nuwarda et al., *An Overview of Influenza Viruses and Vaccines*, 9 VACCINE 1032, 1044-45 (2021).

Petitioner presented to Dr. Valdespino on February 10, 2016 reporting a history of hospitalization for "acute angioedema (facial, tongue)". Pet. Ex. 9 at 10. The next line is illegible, but her examination was normal, and it was noted that her medication was changed upon discharge from the hospital. *Id*. Her diagnosis on that date was hypertension and diabetes. *Id*. There was no report of any other episodes of angioedema, rash, or urticarial lesions noted at that visit. *Id*. Thereafter, there were no records filed of any further episodes of angioedema, "urticarial lesions," rash, or any injuries associated with the flu vaccine in 2016. The remainder of medical visits in 2016 involved care associated with various conditions including a positive tuberculosis test, a motor vehicle accident, and routine gynecological care. *See* Pet. Ex. 9 at 2-11.

Approximately a year and a half after her last visit, petitioner returned to Dr. De La Cruz on September 21, 2017. There was no mention of any episodes of angioedema or other concerns associated with her October 6, 2015 flu vaccine since her last visit. Examination was normal; she was to continue with the same medications. Pet. Ex. 6 at 5-6. On October 19, 2017, petitioner presented with herpes zoster[17] and was prescribed acyclovir.[18] *Id*. at 7-8. She then presented for care on March 8, 2018; August 23, 2018; December 4, 2018; April 4, 2019; April 23, 2019; June 11, 2019; September 21, 2019; October 8, 2019; November 7, 2019 and February 6, 2020. *See generally* Pet. Ex. 28. Throughout these visits, petitioner's medication lists included cetirizine, Pepcid, and hydroxyzine pamoate. There was no mention of any further episodes of angioedema or swelling, and there was no mention in any record that petitioner suffered urticarial lesions following the October 6, 2015 flu vaccine.

On November 17, 2020, petitioner presented to a new allergist, Dr. Nunez at Asthma and Allergy Associates of Florida, for evaluation and management of nasal symptoms. Pet. Ex. 35 at 1. Flu vaccine was listed as a "mild" allergy, and she reported a history of allergic rhinitis,[19] asthma, and angioedema/hives. She reported lip angioedema following flu vaccine in 2015 with three recurrent episodes over the next several months. She was prescribed cetirizine, hydroxyzine, and famotidine. She had not had any symptoms in over a year. *Id*. at 2. Skin testing was positive to dust mites, and she was diagnosed with allergic rhinitis due to perennial allergens and seasonal pollen. The record also documents moderate asthma, well-controlled idiopathic angioedema, and flu vaccine causing almost immediate angioedema in 2015. *Id*. at 5. She was prescribed medication for her asthma and seasonal allergies and hydroxyzine and famotidine were discontinued. *Id*. at 6. At her follow-up visit on December 15, 2020, she reported doing well since starting her new medication. *Id.* at 15.

Dr. Nunez issued an opinion letter in 2021, writing that at his initial consultation with petitioner on November 17, 2020, petitioner reported a "history of chronic urticarial lesions with

---

[17] Herpes zoster is defined as "an acute, infectious, usually self-limited disease believed to represent activation of latent human herpesvirus 3 in those who have become partially immune after an attack of chickenpox. It involves the sensory ganglia and their areas of innervation, and is characterized by severe neuralgic pain along the distribution of the affected nerve with crops of clustered vesicles over the area of the corresponding dermatome". *Dorland's* 842.

[18] Acyclovir is defined as "a synthetic acyclic purine nucleoside with selective antiviral activity; it is active against most known species of human herpesviruses . . . It is used in the treatment of genital and mucocutaneous herpesvirus infections". *Dorland's* 24.

[19] Allergic rhinitis is "a general term used to denote any allergic reaction of the nasal mucosa." *Dorland's* 1613.

angioedema" after a flu vaccine. Pet. Ex. 38 at 1. "Patient stated multiple episodes of angioedema with concurrent urticarial lesions for 'several months.' Patient also reported that urticarial lesions persisted, although at the time of our initial consultation patient had been free of urticarial lesions for >1 year." *Id.* Dr. Nunez added that the duration of the treatment petitioner reported regarding the medications she had taken was not inconsistent with the management of chronic urticaria with angioedema. The medications would only be stepped down once appropriate control was achieved, meaning no breakthrough lesions for a period of at least 6-12 weeks. *Id.* at 2. Dr. Nunez explained that urticaria and angioedema are driven by activation of mast cells which, when activated, release inflammatory mediators, including histamine, heparin, leukotriene $C_4$, and prostaglandin $D_2$, which cause dilation of venules in the skin and enhance venule permeability, resulting in tissue swelling. *Id.* at 3. Dr. Nunez submitted that urticaria and angioedema are pathologically identical processes, with urticaria being a superficial dermal process while angioedema takes place in the deeper levels of the skin and subcutaneous tissues, most often involving the face or mouth. Given the identical nature of both processes, patients are customarily maintained on treatment until well-controlled and ready to wean off medication, without regard to whether it is angioedema or not. *Id.*

Dr. Nunez concluded that given the reported breakthrough urticarial lesions while the patient was compliant with medication, it was medically prudent to continue or even step up therapy until the patient reported control without breakthrough lesions, at which time weaning would be appropriate. "The presence or lack of angioedema is not considered with regards to the duration of treatment as we are only focused on the continued presence of the process (i.e., Mast cell activation) not its presentation (urticaria/angioedema)." Pet. Ex. 38 at 3.

Dr. Nunez did not cite to or present any literature in support of his opinion. He further relied on petitioner's reporting of her history without the benefit of seeing any medical records supportive of the history he recited.

## B.    Procedural History

The petition was filed on September 20, 2018 along with several medical records designated as Petitioner's Exhibits ("Pet. Ex.") 1-6. ECF No. 1. The matter was initially assigned to then-Chief Special Master Dorsey and the Special Processing Unit ("SPU"), and an SPU Initial Order issued on that date for the completion of the filing of medical records by October 1, 2018. ECF Nos. 4, 5. An initial conference was held on November 6, 2018 and additional medical records were ordered. ECF No. 8. Petitioner filed additional medical records designated as Pet. Ex. 7-26 on December 21, 2018, and a Statement of Completion on January 29, 2019. ECF. Nos. 11,12. After two Motions for extension of time to file his status report, both granted, respondent filed his status report on July 22, 2019. ECF Nos. 13, 14, 18, 19, 20. Respondent advised that he was not in a position to engage in settlement discussions and requested a deadline for his Rule 4(c) Report. ECF. No. 20.

Following a Motion for extension of time until September 27, 2019, which was granted, respondent filed his Rule 4(c) Report ("Resp. Rpt."). ECF No. 21-23. Respondent submitted that petitioner does not satisfy the requirements under the Act or the Qualifications and Aids to Interpretation ("QAI") for a table claim of anaphylaxis nor does she satisfy the six-month

requirement. (Citations omitted). Resp. Rpt. at 4. Further, on the record existing at the time, petitioner submitted no reliable evidence of actual causation. *Id*. at 6.

The matter was reassigned to Chief Special Master Corcoran on October 1, 2019 and then to the undersigned on April 3, 2020 following the filing of additional medical records requested in respondent's Rule 4(c) Report and designated as Pet. Ex. 27-30. ECF Nos. 25-30. Additional medical records designated as Pet. Ex. 31-34 were filed on July 2, 2020. ECF No. 32.

In a status report filed on August 10, 2020, respondent repeated his belief that this case was not appropriate for compensation and asked that it proceed on a litigation track. ECF No. 34.

A status conference on September 30, 2020 discussed the issues in this case in detail, specifically the six-month severity requirement. A detailed Order was issued, and petitioner was provided 60 days within which to file a report from Dr. De La Cruz. ECF No. 35.

Another status conference was held on March 3, 2021 after an affidavit was filed on November 6, 2020 in response to the Court's September 30, 2020 Scheduling Order. Petitioner filed another status report on December 1, 2020 and additional medical records on February 26, 2021 designated as Pet. Ex. 35. ECF Nos. 36-38. Following the March 3, 2021 status conference, petitioner was ordered to file a report from her new treating allergist, Dr. Nunez. ECF No. 40.

On April 12, 2021, additional medical records were filed, designated as Pet. Ex. 36 and 37. ECF No. 42. After several status reports and the issuance of a subpoena, Dr. Nunez's opinion letter was filed on June 1, 2021. Pet. Ex. 38; ECF No. 43, 44, 45, 47.

On July 1, 2021, respondent filed a status report that he still did not believe this case was compensable and asked that it proceed on a litigation track. ECF No. 48.

A status conference was held on August 12, 2021, after which respondent was ordered to file a responsive expert report. ECF No. 49. After three Motions for extension of time which were granted, respondent filed the report of Dr. Fadugba on November 30, 2021. ECF No. 50, 52-54.

On December 30, 2021, petitioner filed her Motion for Interim Attorneys' Fees and Costs. ECF No. 57.

Petitioner then filed an expert report from Dr. Gershwin on February 10, 2022. ECF No. 59.

After a Motion for extension of time which was granted, respondent filed his response to petitioner's motion on April 13, 2022. ECF No. 60; Response, ECF No. 62. In his response, respondent submitted that before a Special Master can exercise discretion of whether to award fees and costs in uncompensated cases like the current case, a petitioner must first establish that the petition was filed in good faith and with a reasonable basis and/or that the matter maintained reasonable basis during the pendency of the case. (Citations omitted). Response at 1. Respondent thus submits that the Special Master must determine whether this matter was filed in good faith and with a

reasonable basis and/or maintained a reasonable basis while pending before considering whether petitioner has satisfied the standards for an interim fee award. *See generally* Response.

## II.      Applicable Law

### A.      Reasonable Basis

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petitioner succeeds on the merits of his or her claim, the award of attorneys' fees is automatic. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). However, a petitioner need not prevail on entitlement to receive a fee award, as long as the petition was brought in "good faith" and there was a "reasonable basis" for the claim to proceed. § 15(e)(1).

Reasonable basis" is not explicitly defined in the Vaccine Act or Rules. Section 15(e) of the Vaccine Act explains that the petition must include "an affidavit, and supporting documentation, demonstrating that the person who suffered such injury" received a covered vaccine in the United States; sustained a vaccine-caused injury that lasted more than six months; and has not collected damages in a previous claim. § 300aa–11(c)(1).

Deciding whether a claim has a reasonable basis "is within the discretion of the Special Master . . . ." *Simmons v. Sec'y of Health & Hum. Servs.,* 875 F.3d 632 (Fed. Cir. 2017) (internal citations omitted). Reasonable basis can be present when a case is filed and can be lost as more information comes to light. *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 286 (2014). A reasonable basis determination is based on a totality of the circumstances inquiry that can be satisfied by reviewing the factual, medical, and jurisdictional support for a claim. *See Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344–45 (Fed. Cir. 2020); *Chuisano*, 116 Fed. Cl. at 288. It does not look to the "likelihood of success but more to the feasibility of the claims." *Chuisano*, 116 Fed. Cl. at 285. The amount of objective evidence that satisfies reasonable basis is more than a scintilla of evidence but less than preponderant evidence. *Cottingham*, 971 F.3d at 1344–45. However, a petitioner's own statements cannot alone support reasonable basis and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Hum. Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

"Special masters have historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). Typically, reasonable basis is not found when "fundamental inquires [sic] are not made." *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). To ensure reasonable basis, an attorney should make a pre-filing inquiry into the claim, and it must be supported by medical records or medical opinion. *Mack v. Sec'y of Health & Human Servs*., No. 15-149V, 2017 WL 5108680, at *3 (Fed. Cl. Spec. Mstr. Sep. 28, 2017) (internal citations omitted). While leniency has been shown when the statute of limitations was about to expire, counsel may not use an impending statute of limitations deadline to establish reasonable basis for a claim. *Simmons v. Sec'y of Health & Human Servs*., 875 F.3d 632, 636 (Fed. Cir. 2017).

### B.    Awarding Interim Fees

There are several factors considered when a petitioner requests an award of interim fees. Interim fees have been deemed appropriate where the petitioner has established that the cost of litigation has imposed an undue hardship. *Shaw v. Sec'y of Health & Human Servs.*, 609 F.3d 1372, 1377 (Fed. Cir. 2010); *see also Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008) ("Interim fees are particularly appropriate where proceedings are protracted and costly experts must be retained.") Additionally, interim fees may be awarded when petitioner's counsel withdraws from a case. *Woods v. Sec'y of Health & Human Servs.*, 105 Fed. Cl. 148, 154 (2012). However, "the mere fact that an attorney plans to withdraw is not necessarily a hardship that triggers an award of interim attorneys' fees and costs." *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. at 297, 300 (2011). The burden is also on the petitioner to demonstrate that their claim meets the "good faith" and "reasonable basis" requirements. *Avera*, 515 F.3d at 1352; *Shaw*, 609 F.3d at 1575. If the petitioner fails to carry this burden, "[t]he special master may determine that she cannot assess the reasonableness of certain fee requests prior to considering the merits of the vaccine injury claim." *Shaw*, 609 F.3d at 1377. Ultimately, it is within the special master's discretion to determine whether an award of interim fees is appropriate. *Avera,* 515 F.3d at 1352.

Other special masters have taken this tactic when faced with requests for interim fees where the petitions walk the line on reasonable basis. In *Morris v. Sec'y of Health & Human Servs.*, No. 12-415V, 2014 WL 8661863 (Fed. Cl. Spec. Mstr. June 4, 2014), the special master deferred interim fees after he was unable to find reasonable basis for filing the petition. The petitioner in question had offered neither a theory of causation nor an expert medical opinion in support of the claim. However, the allegations of the petitioner and a temporal relationship between the vaccination and illness alone are insufficient to meet the reasonable basis standard. *See Graham v. Sec'y of Health & Human Servs.*, No. 14-48V, 2014 WL 10558839 at *5 (Fed. Cl. Spec. Mstr. Sept. 10, 2014), *mot. for rev. denied*, 124 Fed. Cl. 574 (2015), (citing *Chuisano*) (stating that temporal proximity is not enough to satisfy the requirement of reasonable basis). Additionally, there was a significant gap in time between the petitioner's vaccination and his first documented complaint of symptoms. The special master chose to defer ruling on petitioner's request for interim fees with the hope that petitioner "could identify evidentiary support for his claim [that] would rectify what first appeared to be a significant deficiency." *Id*. at *8.

Special masters have also deferred ruling on interim fee applications to avoid prejudice to the petitioner. In *Austin v. Sec'y of Health & Human Servs.*, No. 10-362V, 2012 WL 592891 (Fed. Cl. Spec. Mstr. Jan. 24, 2012), the special master deferred ruling on interim fees to avoid the exhaustive factual review that is inherent in determining reasonable basis. The special master expressed concerns that a thorough evaluation of the strengths and weaknesses of the petition would affect petitioner's ability to find new counsel. Additionally, the special master suggested that evaluating reasonable basis at the conclusion of the entitlement phase of the case would allow her to "consider as complete a record as possible." *Id*. at *5.

### III.     Discussion

In this matter, satisfaction of the six-month severity requirement is unresolved and remains at issue.

Succinctly, the contemporaneous medical records filed in this matter corroborate that petitioner suffered an episode of angioedema on October 6, 2015, the same day she received a flu vaccination.  She was hospitalized a month later, on November 9, 2015, with facial and lip swelling "since last night" and notable diabetes with an expected rise in blood levels due to steroid use to treat the swelling. Pet. Ex. 4 at 1, 9, 12. There is no record of itching, rash, or urticarial lesions. *Id.* at 22. When she visited Dr. De La Cruz on November 23, 2015 for follow-up, he documented an "allergic reaction" with angioedema. There was no mention of any further episodes or symptoms on that date. She was to continue taking the medications she had been taking. Pet. Ex. 28 at 1. Petitioner returned to Dr. De La Cruz on December 15, 2015, examination was again normal, and she was advised to continue taking the prescribed medication. There was no mention of any additional episodes of angioedema, facial or lip swelling on that date. Pet. Ex. 6 at 4-5. At a February 10, 2016 general medical visit, she reported having been hospitalized for angioedema. She had no symptoms on that date and did not report any additional episodes of angioedema since her hospitalization on November 9, 2015.

Petitioner received her vaccine on October 6, 2015, suffered an episode of angioedema later that day and another one month later, on November 9, 2015. Whether her angioedema was caused by the flu vaccine remains unresolved. Thereafter and for a period of 19 months between February 10, 2016 and September 21, 2017, petitioner did not present to or report to any medical provider any further episodes of angioedema. She did not follow up with any physician regarding the medications she was prescribed in October 2015 and/or the necessity of continuing to take them.

Medical records created contemporaneously with the events they describe are generally presumed to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). Contemporaneous medical records are also afforded more weight than petitioner statements created after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Overall, contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Id.*

Petitioner's affidavit is the only evidence presented of any episodes of angioedema other than those reflected in the medical records on October 6, 2015 and November 9, 2015, and her affirmation of several episodes over several months does not support sequela in excess of six months as required. Further, Dr. Nunez's opinion letter is based on a history provided by petitioner five years after the events and includes urticarial lesions, which are not mentioned anywhere in her medical records or her affidavit in this case. Dr. Nunez assumes that she had ongoing angioedema and sequela from her flu vaccine, but this is not corroborated anywhere in the medical records. Therefore, Dr. Nunez's opinions fail to support petitioner's requirement to satisfy the six-

month requirement. Further, while petitioner has filed an expert report from Dr. Gershwin as to causation, unless and until the six-month severity requirement is satisfied, those opinions are not relevant.

Accordingly, it would be premature to rule on a Motion for Interim Attorneys' Fees and Costs while the six-month severity requirement remains at issue and respondent has raised good faith and reasonable basis in this matter.

### IV.      Conclusion

For the reasons contained herein, I defer ruling on petitioner's application for interim attorneys' fees and costs at this time. I will reconsider the existing application at a later date.

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master